Below is an opinion of the court.

_David W. Hercher_
DAVID W. HERCHER
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In re

**Robert Leslie Ezell**,

      Debtor.

Case No. 21-31465-dwh13

MEMORANDUM DECISION ON
UNITED STATES TRUSTEE'S
MOTION TO DISMISS OR
CONVERT

## I.    Introduction[1]

Acting United States Trustee Gregory M. Garvin moved to dismiss or
convert this chapter 13 case to chapter 7. Because debtor, Robert Ezell, has
acted in bad faith and egregiously, I will grant the motion and convert this
case.

---

[1] This disposition is specific to this case. It may be cited for whatever
persuasive value it may have.

Page 1 – MEMORANDUM DECISION ON UNITED STATES etc.

## II.     Background

Ezell initiated this case by filing his petition under chapter 7 on June 29, 2021. Kenneth Eiler was appointed trustee. On August 3, 2021, Ezell converted this case to chapter 13. On November 1, 2021, the U.S. trustee filed the pending motion to dismiss or convert this case back to chapter 7.

## III.    Analysis

### A.      *For cause, the court may dismiss a chapter 13 case or convert it to chapter 7.*

Under 11 U.S.C. § 1307(c), on the request of the U.S. trustee, the court may dismiss a chapter 13 case or convert it to chapter 7 for cause. (Other section references are also to sections of title 11.) The grounds for cause include the debtor's failure to commence plan payments.[2] If the court finds cause for dismissal or conversion, it must select the remedy that is in the best interest of creditors and the estate.

Because the statute defines cause as "including" the eleven enumerated grounds, they are nonexclusive.[3] In the Ninth Circuit's 1999 decision in *In re Leavitt*,[4] it held that the debtor's bad faith can be an unenumerated ground for cause, and in determining whether bad faith exists, the bankruptcy court should consider the totality of circumstances, including these four factors—

- whether the debtor misrepresented facts in the petition, unfairly manipulated the bankruptcy code, or otherwise filed in an inequitable manner,

---

[2] §§ 1307(c)(4), 1326(a)(1)(A).
[3] § 102(a)(3).
[4] 171 F.3d 1219, 1224 (9th Cir. 1999).

Page 2 – MEMORANDUM DECISION ON UNITED STATES etc.

- the debtor's history of filings and dismissals,

- whether the debtor only intended to defeat state-court litigation; and

- whether "egregious behavior is present."[5]

In determining that egregious behavior was present in *Leavitt*, the court pointed to the debtor's failure to offer any "real justification or excuse for his actions," which were failing to disclose his assets and financial dealings.[6] The court's explanation that egregiousness is present when a debtor fails to justify or excuse disclosure failures is consistent with the dictionary definition of egregious as "conspicuously bad."[7]

A debtor must file a schedule of assets and liabilities and a statement of financial affairs.[8] Because the bad-faith determination requires consideration of the totality of circumstances and the four bad-faith factors are not independent bases for finding bad faith, a debtor's failure to make required disclosures in the schedules and SoFA is relevant to but not dispositive of the first bad-faith factor, misrepresentation of facts in the petition. Whether a disclosure failure in fact constitutes bad faith must be determined in light of whether it is egregious, i.e., done without justification or excuse, such as with a credible misunderstanding of facts or reasonable misunderstanding of the requirements of the schedule and SoFA forms. In other words, egregiousness

---

[5] *Id*. at 1224.
[6] *Id*. at 1225.
[7] https://www.merriam-webster.com/dictionary/egregiousness#other-words, last viewed June 14, 2022.
[8] § 521(a)(1)(B)(i), (iii); Fed. R. Bankr. P. 1007(b)(1)(A), (D).

Page 3 – MEMORANDUM DECISION ON UNITED STATES etc.

is not an independent ground for finding bad faith, but instead it is a measure of the seriousness of another factor, such as a disclosure failure under the first factor.

Here, the U.S. trustee's motion invoked the unenumerated cause ground of bad faith and addressed the first and fourth bad-faith factors by alleging that Ezell misrepresented facts in the schedules and SoFA and behaved egregiously. At the hearing, the U.S. trustee also relied on Ezell's failure to commence plan payments.

### B.   *Ezell's bad faith is a ground for cause to dismiss or convert.*

#### 1.   Ezell omitted or misrepresented facts in the schedules and SoFA.

Addressing the first bad-faith factor, the U.S. trustee alleges that Ezell omitted or misrepresented facts in the schedules and SoFA.

##### (a)   He failed to disclose ownership of his membership interest in the LLC.

As required by Federal Rule of Civil Procedure 9009(a), Ezell used form B 106A/B as the property schedule and form B 107 as the SoFA; they are both official forms prescribed by the Judicial Conference of the United States. A debtor must schedule an interest in a company, including shares in a corporation or a membership interest in a limited liability company, in Schedule A/B, item 19. And a debtor must state in the answer to SoFA question 27 whether the debtor, within four years before the petition date, had a connection to a business, such as by being a limited liability company

member. If the answer is yes, the debtor must also provide details about the business.

Ezell was a member of Wood River Lodge LLC.[9] He didn't schedule that interest anywhere.[10] I have no evidence that the LLC owned anything other than the Wood River Lodge property, which it sold before the petition date. On the other hand, I have no evidence that the LLC was dissolved before the petition date. Thus, correct scheduling would have disclosed the LLC membership interest with a value of $0.

In Ezell's answer to question 27, he listed only Ezell Enterprises, Inc., a corporation of which he was the sole shareholder; he did not list the LLC membership interest. So, even if scheduling of the membership interest were excusable because the interest had no value due to the property sale, or even if the LLC had been dissolved between the sale and the petition date, he was required to disclose his membership interest in the answer to SoFA question 27. That disclosure would have enabled parties in interest to decide whether to inquire further about distributions to him on account of his membership interest.

Ezell testified inconsistently about his failure to disclose the LLC. He didn't remember why he didn't disclose it. He disputed that he was required to disclose "all companies," but later conceded that he knew he had to disclose

---

[9] ECF No. 66, Ex. 15, page headed "Rob Ezell – Wood River Lodge LLC."
[10] ECF No. 66, Ex. 22 at 6, Ex. 23; ECF Nos. 10, 35.

"all companies." He claimed not to remember signing the schedules and SoFA or testifying at the meeting of creditors that he signed those documents.[11] I don't credit his testimony that he did not understand his requirement to disclose his interest in the LLC.

**(b)    He failed to list year-to-date income.**

In response to SoFA question 4, the debtor must disclose the amount and source of income from employment or operating a business for the current year and the two prior calendar years. In response to question 5, the debtor must disclose the amount and source of any income other than from employment or operating a business, regardless of whether it is taxable. That other income includes dividends.

Ezell's answer to question 4 disclosed income only for 2019, the second calendar year before the 2021 petition year. It disclosed no income for 2020 or the prepetition portion of 2021. And in his answer to question 5, he disclosed no other income. Ezell did have prepetition 2021 income. He received the following checks payable to himself, which were income to him when received, even though he deposited them to Enterprises' account:

- May 5, 2021, check for $41,662.24 from Deschutes County Title Company as a commission for the property sale.[12]

- Three May 15, 2021, checks from the LLC[13] for $319.34 with the memorandum "miles & exp," for $65,810.86 with the memorandum

---

[11] ECF No. 66, Ex. 17 at 3-4; line 21.
[12] ECF No. 66, Ex. 1 at 1; Ex 4.
[13] ECF No. 66, Ex. 1 at 2; Ex. 5.

"sale of wood," and for $517.15 with the memorandum "HPS & AIRBNB."

- June 2, 2021, check for $31,183.89 from Western Title as "commissions."[14]

Each of those checks was income of some type to Ezell and thus should have been disclosed in his answers to either question 4 or question 5. The largest of those payments, $65,810.86 from the LLC, presumably was a distribution of his allocable membership share of the net proceeds of the LLC's property sale.

### (c)    He understated the value of Enterprises.

Ezell initially scheduled his shares in Enterprises with a value of $0.[15] In the postconversion schedules, he changed that value to $1,000.[16]

As of June 28, 2021, the day before the petition date, the balance in Enterprises' credit-union account was $66,437.52.[17] Enterprises owed a single debt of $12,000 to First Interstate Bank.[18] Thus, the net value of Enterprises at the petition date was $54,437.52, and Ezell improperly valued it at $0.

### (d)    He failed to disclose the $52,000 payment to Rebecca Jones.

For a debtor whose debts are primarily consumer debts, SoFA question 6 requires disclosure of payments of $600 or more that "you" (the debtor) paid to a creditor during the 90 days before the petition date. That disclosure

---

[14] ECF No. 66, Ex. 1 at 7; Ex. 7.
[15] ECF No. 66, Ex. 22, item 19; ECF No. 10, item 19.
[16] ECF No. 66, Ex. 23, item 19; ECF No. 35, item 19.
[17] ECF No. 66, Ex. 1 at 5.
[18] ECF No. 66, Ex. 17 at 11:3-6.

requirement corresponds with the trustee's power to recover preferential payments made with property of the debtor.[19]

Ezell personally owed Jones $52,000 before the petition date.[20] That debt was paid by a check for that amount drawn on the Enterprises account on May 17, 2021. Ezell disclosed nothing in response to question 6.

The U.S. trustee's argument that the payment to Jones should have been disclosed in Ezell's answer to SoFA question 6 assumes that payments from the Enterprises account should be treated as having been made by Ezell (the "you" referenced in question 6). Ezell did not dispute that assumption—or its extension, that the account is his property—and I will thus accept it for the purpose of deciding the motion. With that assumption, and because Jones was a creditor of Ezell and the payment to her exceeded $600 and was made within the 90-day period, the payment should have been disclosed in response to question 6.

Treating the Enterprises account as property of Ezell, he was required to have scheduled it in Schedule A/B, item 17, with a value of $66,437.52. I have no evidence that the first account that he did schedule corresponds to the Enterprises account. The four-digit number associated with the scheduled account, 1876, does not correspond with the number displayed on the account statements in evidence, 1880. And the scheduled value of that account,

---

[19] § 547(b).
[20] ECF No. 66, Ex. 15 promissory note.

$1,000, does not correspond with any evidence of the value of the Enterprises account.[21]

Even if the Enterprises account were property of Enterprises, Ezell was required to have scheduled the indebtedness due to him from Enterprises in Schedule A/B in item 33 (claims against third parties), 34 (other contingent and unliquidated claims), 35 (financial assets not already listed), or 53 (other property of any kind not already listed). He did not. His trial testimony did not support his failure either to schedule Enterprises as worth $54,437.52 or to schedule the Enterprises account or a debt due to him from Enterprises as his property. When asked at trial why he scheduled Enterprises with a $0 value, he answered "I'm not sure." When asked at trial why the check to his law firm to make the plan payment was drawn on the Enterprises account, he said "I'm a sole proprietor of an S Corp." That answer suggests that he treated the Enterprises account as legally indistinguishable from one in his own name.

Ezell was required to list the payment to Jones as a potential preference. Because I have determined, for the purpose of the motion, to treat the Enterprises account as his property, he was required to have disclosed the payment to Jones, made from that account, in the answer to SoFA question 6.

---

[21] ECF No. 66, Ex. 1.

### (e) I will not consider nondisclosure of the drift boat.

Ezell's failure to schedule a drift boat was not alleged in the motion. In a contested matter, pleadings are not deemed amended to conform to the evidence.[22] I thus will not consider the failure to schedule the drift boat as cause.

### 2. Ezell has behaved egregiously.

Addressing the fourth bad-faith factor, the U.S. trustee alleges that Ezell has behaved egregiously.

### (a) He concealed assets.

The U.S. trustee alleges that egregiousness is present because Ezell concealed assets that could be used to pay creditors. I take this allegation to mean that his failure to schedule assets was without justification or excuse and thus egregious. I agree. He gave no credible evidence to justify or excuse his omissions and misrepresentations in his schedules and SoFA addressed above.

### (b) He converted after steps taken by the chapter 7 trustee.

The U.S. trustee alleges that egregiousness is present because Ezell converted his case to chapter 13 after Eiler took steps to recover concealed assets, including requesting documents from Ezell and objecting to his individual retirement account exemption. I take this allegation to mean that

---

[22] Fed. R. Bankr. P. 9014(c) (not applying Fed. R. Bankr. P. 7015 to contested matter); Fed. R. Civ. P. 15(c)(1).

Ezell converted to chapter 13 to prevent, or at least delay, the need to answer Eiler's questions about his assets and to defendant the exemption objection.

Although conversion to chapter 13 is not, by itself, improper or conclusive evidence of bad faith, it can be evidence of bad faith if the only benefit to the debtor of conversion is to avoid performing obligations the debtor would have had to perform but for conversion. Here, Ezell didn't have either of two common legitimate reasons for converting to chapter 13: curing and reinstating a residential-mortgage default or paying the nonexempt equity over the plan's life[23] and discharging debts that would be nondischargeable in a chapter 7 case.[24] He also didn't initially use chapter 13 as an opportunity to acknowledge that his creditors should be paid in full because his nonexempt property was worth more on the petition date than the total amount of all claims. At the petition date, the balance in the unscheduled Enterprises account was $66,437.52.[25]

Without considering the Enterprises account, Ezell used all but $329 of his wildcard exemption and, so that amount is the most that he could exempt from the account, leaving as nonexempt estate property $66,108.52.[26] The total amount of his scheduled debts was $45,457.24.[27] That amount is consistent with the total amount of filed proofs of claim, excluding Eiler's for

---

[23] § 1322(b)(5).
[24] § 1328(a)(2).
[25] ECF No. 66, Ex. 1.
[26] ECF Nos. 10, 35.
[27] ECF No. 10, Official Form 106Sum, part 2.

postpetition trustee services, which is $41,314.29. Thus, without accounting for any other nonexempt property, the nonexempt portion of the Enterprises account exceeded the total amount of his debts. A chapter 13 plan could not be confirmed without paying creditors the amounts they would receive in a chapter 7 case.[28] Yet the only plan he has filed proposed payments that he estimated would equal only 7 percent of their claims.[29]

At trial, Ezell said that, if the case were neither dismissed nor converted, he would amend his plan to provide for payment of creditors in full.[30] Even treating that commitment as enforceable and feasible, it neither justifies nor excuses the 7-percent plan proposal in the only plan that he did file.

Thus, I agree with the U.S. trustee that conversion was motivated by Ezell's desire to avoid coming clean about property that he failed to schedule and that he used after the petition date without authorization. Conversion for that purpose was egregious behavior.

### (c)    He failed to amend his schedules after conversion.

The U.S. trustee alleges that egregiousness is present because Ezell failed to amend his schedules after conversion to disclose facts uncovered by Eiler. I agree.

---

[28] § 1325(a)(4).
[29] ECF No. 37.
[30] ECF No. 68, Ex. B.

Page 12 – MEMORANDUM DECISION ON UNITED STATES etc.

Eiler uncovered, even if at least in part with Ezell's cooperation, Ezell's failure to schedule his membership interest in the LLC and his undervaluation of Enterprises. From the time Ezell signed the initial schedules on July 13, 2021,[31] he had a continuing obligation to make any necessary corrections, regardless of whether the true facts are first uncovered by the trustee.[32]

Although Eiler's uncovering of facts did not create Ezell's obligation to amend the schedules, it eliminated any justification or excuse for his failure promptly to amend his schedules. And it didn't excuse him from amending his schedules to disclose those facts. The formal, public disclosure of property required to be scheduled ensures that the true information is available to parties in interest other than a trustee who learned of the property, including any successor trustee and all creditors.

### (d) He filed a chapter 13 plan proposing to pay 7 percent to unsecured creditors.

The U.S. trustee alleges that egregiousness is present because, although Ezell had sufficient assets to pay creditors in full, he filed a chapter 13 plan proposing to pay unsecured creditors a dividend of only 7 percent.[33] I agree, for the reasons discussed in part III.B.2(d) above.

---

[31] ECF No. 10, Official Form 106Dec.
[32] § 521(a)(1); Fed. R. Bankr. P. 1007(c) (documents filed before conversion are deemed filed in converted case "unless the court directs otherwise"); ECF No. 20 ¶ 1.a.
[33] ECF No. 37.

### (e)    He disposed of estate property.

The U.S. trustee alleges that egregiousness is present because Ezell disposed of estate property by gifting it to family members and gambling it away. A chapter 7 debtor must turn over to the trustee nonexempt estate property that is not of inconsequential value or benefit to the estate.[34] The debtor's failure to turn over estate property would permit the trustee to sue and obtain a money judgment against the debtor for the amount or value of the property; that judgment would come after the petition date and thus not be affected by any chapter 7 discharge.[35]

Ezell has not scheduled, and thus has not claimed as exempt, the Enterprises account, which I'm treating as estate property. He thus had, at least until conversion, an obligation to pay to Eiler $66,108.52, the minimum nonexempt value of that account on the petition date, as calculated in part III.B.2(b) above.

On July 25, 2021, the day before the chapter 7 meeting of creditors, the balance in the Enterprises account was $76,210.96.[36] At the chapter 7 meeting of creditors, Eiler unequivocally warned Ezell that the Enterprises account was estate property that he could not disburse.[37] He responded by saying that the notion that he couldn't disburse those funds "doesn't settle

---

[34] § 542(a).
[35] § 727(b).
[36] ECF No. 66, Ex. 1 at 15.
[37] ECF No. 66, Ex. 17 at 12:22 – 13:6.

well with me."[38] Later the same day, he withdrew $5,000 in cash.[39] The next day, he withdrew $39,800, the sum of $400 to a payee whose name is redacted,[40] $9,400 to himself,[41] $10,000 to his college-student daughter,[42] and $20,000 to cash.[43]

On July 30, 2021, Ezell disbursed $18,580.49 to pay payroll to himself.[44] On July 31, 2021, the last day of the most recent account statement in evidence, the account balance was $785.99.[45] At the September 3, 2021, chapter 13 meeting of creditors, he testified that the account balance was $1,000.[46]

Ezell also testified at the chapter 13 meeting of creditors that he gave his daughter $10,000 to use for college.[47] At trial, he testified that he withdrew the $20,000 because he has a gambling problem, and he gambled that amount away in Nevada within a week.

Treating the account as containing only property of Ezell, he had an affirmative obligation to pay Eiler at least the entire account balance as of the petition date. That money was the estate's, not his. He had no

---

[38] ECF No. 66, Ex. 17 at 13:4-7.
[39] ECF No. 66, Ex. 1 at 15, Ex. 9.
[40] ECF No. 66, Ex. 1 at 15, Ex. 11.
[41] ECF No. 66, Ex. 1 at 15, Ex. 11.
[42] ECF No. 66, Ex. 1 at 15, Ex. 11.
[43] ECF No. 66, Ex. 1 at 15, Exs. 10.
[44] ECF No. 66, Ex. 1 at 16, Ex. 18 at 14:9-20.
[45] ECF No. 66, Ex. 1 at 17.
[46] ECF No. 66, Ex. 18 at 14:25 – 15:4.
[47] ECF No. 66, Ex. 17 at 14:22-24.

justification or excuse for any of his postpetition disbursements from the account. Especially in view of Eiler's warning to Ezell not to make disbursements from the Enterprises account and Ezell's response that Eiler's warning didn't "settle well" with Ezell, those disbursements were egregious activity.

### (f)    I will not consider whether he failed to respond to U.S. trustee's requests for additional information.

The U.S. trustee alleges that egregiousness is present because Ezell failed to respond to the U.S. trustee's requests for additional information to determine whether his claim of exemption in the 401(k) account with proceeds of the LLC sale is exemptible under section 522(d)(12). I disagree.

A debtor's statutory duty of cooperation runs to the case trustee, not the U.S. trustee.[48] The U.S. trustee did not seek to examine Ezell under oath before filing the motion,[49] and I have no evidence that he failed to comply with any interrogatories or document-production requests made in connection with the motion.[50]

### 3.    I will not consider other factors or ground.

Neither party addressed the second and third bad-faith factors, the debtor's history of filings and dismissal and whether the debtor only intended to defeat state-court litigation. I understand *Leavitt* to require the

---

[48] § 521(a)(4).
[49] Fed. R. Bankr. P. 4001.
[50] Fed. Rs. Bankr. P. 9014(c), 7033, 7034.

Page 16 – MEMORANDUM DECISION ON UNITED STATES etc.

bankruptcy court to consider the second and third factors if either party raises them, but not to require the court to make findings regarding those factors as a condition to finding bad faith as cause.

The U.S. trustee argued at trial that Ezell's failure to start making plan payments is cause for dismissal or conversion. Ezell himself testified that his Exhibit A, a check for $1,476, is the amount due for the first six plan payments.[51] The check is payable to his law firm's trust account, and he did not offer evidence that any payment had been made to the chapter 13 trustee. He thus proved that he had made no plan payments.

The U.S. trustee argued at trial that Ezell's failure to make chapter 13 plan payments was an additional cause for dismissal or conversion. But the U.S. trustee did not rely in his motion on Ezell's failure to make plan payments as a ground for cause. And because the motion initiated a contested matter, and not an adversary proceeding, the motion is not deemed to have been amended to conform to the trial evidence.[52] I thus will not consider Ezell's failure to make plan payments as cause.

### C. *I will convert this case to chapter 7.*

Having determined that cause exists to dismiss or convert, I must now determine whether to leave this case in chapter 13, convert it to chapter 7, or dismiss it.

---

[51] ECF No. 68, Ex. A.
[52] Fed. Rs. Bankr. P. 9014(c), 7015; Fed. R. Civ. P. 15(b)(1).

### 1.   I cannot not leave this case in chapter 13.

The U.S. trustee argued at trial that, if I find cause to dismiss or convert, I have no discretion to do neither. That would be correct if this case were under chapter 11. But under section 1307(c), the court for cause "may" convert of dismiss a chapter 13 case. Thus, after finding cause, I nonetheless have discretion to decline to dismiss or convert.

On the other hand, no point would be served by leaving this case in chapter 13 unless it were theoretically possible that I could confirm a plan, which I could not do without making the finding required by section 1325(a)(7) that "the action of the debtor in filing the petition was in good faith."

In its 1982 decision in *In re Goeb*,[53] the Ninth Circuit originated the multifactor standard for determining whether a chapter 13 plan has been filed in good faith. Those factors are "whether the debtor has misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan in an inequitable manner."[54]

In its 1994 decision in *In re Eisen*,[55] the circuit recognized bad faith as cause for dismissing a case and observed that, to determine whether a petition has been filed in bad faith, "courts are guided by the standards used

---

[53] 675 F.2d 1386 (9th Cir. 1982).
[54] *Id.* at 1390.
[55] 14 F.3d 469 (9th Cir. 1994),

to evaluate whether a plan has been proposed in good faith."[56] The court then quoted *Goeb* to show factors for determining whether the plan was filed in bad faith: "A judge should ask whether the debtor 'misrepresented facts in his [petition or] plan, unfairly manipulated the Bankruptcy Code, or otherwise [filed] his Chapter 13 [petition or] plan in an inequitable manner.'"[57] The *Eisen* court then added two other factors—history of filings and intent to frustrate nonbankruptcy litigation—that had been established by decisions rendered after *Goeb*.

In the 1999 *Leavitt* decision, the circuit recast the first of the *Eisen* factors as "whether the debtor 'misrepresented facts in his [petition or] plan . . ..,"[58] and then, in applying that factor against the debtor, observed that he had "failed to fully disclose assets and financial dealings" and that "[h]is initial schedules omitted some assets and undervalued others."[59]

In 2005, Congress added section 1325(a)(7), making good faith in the filing of the petition an express confirmation requirement after its converse, bad faith, had a well-defined meaning in chapter 13.

Thus, under *Eisen* and *Leavitt*, the standards for evaluating good faith in section 1325(a)(7) include determining whether the debtor correctly represented facts in his petition, fully disclosed assets and financial dealings,

---

[56] *Id*. at 470.
[57] *Id*. citing *Goeb*, 675 F.2d at 1390 (bracketed material added by the *Eisen* court).
[58] 171 F.3d at 1224.
[59] *Id*. at 1225.

Page 19 – MEMORANDUM DECISION ON UNITED STATES etc.

and correctly completed schedules. In other words, the lack of good faith under section 1325(a)(7) can be demonstrated by the debtor's failure, without justification or excuse, to correctly complete the schedules and SoFA.

I have found in part III.B above that Ezell's bad faith warrants dismissal or conversion, and a substantial portion of that bad faith was his omission or misrepresentation of facts in the schedules and SoFA. Thus, regardless of the terms of any plan that he might propose, I could not find that his action in filing the petition was in good faith or confirm any plan. So, no purpose would be served by leaving this case in chapter 13.

> **2.    Conversion, rather than dismissal, is in the best interest of creditors and the estate.**

Having determined that I cannot leave this case in chapter 13, I must select dismissal or reconversion to chapter 7.

In the motion, the U.S. trustee argued that conversion, rather than dismissal, is in the best interest of creditors and the estate because—

- The prepetition payment to Jones is potentially recoverable as a preference under section 547;

- Unauthorized postpetition disbursements of estate property are potentially recoverable from the transferees[60] or from Ezell himself;[61] and

- He intends to pursue denial of Ezell's chapter 7 discharge.[62]

---

[60] § 549(a),

[61] §§ 521(a)(4), 542(a)

[62] § 727.

Page 20 – MEMORANDUM DECISION ON UNITED STATES etc.

Ezell did not directly contest any of those allegations, although he disputed the collectability of any avoidance judgments that Eiler might obtain. As to Jones, he testified without contradiction that she lives in South Africa with no plans to return to the U.S. He argues that, if I decline to confirm the plan, I should prefer dismissal over reconversion.

### (a)    Dismissal

If the case is dismissed, the automatic stay would terminate, allowing creditors to pursue Ezell, and he would not receive a discharge.

The disadvantages of dismissal include the following:

- Creditors would incur the expense and delay of individual lawsuits and collection efforts. In view of Ezell's egregious bad-faith behavior in connection with this case, he might take steps outside of bankruptcy to delay or impede creditor collection.

- Creditor recoveries would be on a first-come, first-served basis, rather than ratable bankruptcy distributions.

- Creditors couldn't use bankruptcy-specific avoidance and recovery powers under sections 547, 549, and 550.

- Ezell could file a new petition.

### (b)    Reconversion to chapter 7

The advantages of chapter 7 include the following:

- Ezell could not exercise the power to dissipate estate assets, including his IRA if it turns out not to be exempt.

- The trustee could pursue bankruptcy-specific claims, including under section 547 against Jones and under nonfraudulent-transfer claims under section 549(a) against postpetition transferees.

- The trustee would act collectively on behalf of all creditors to pursue and ratably distribute recovery on potential fraudulent-

Page 21 – MEMORANDUM DECISION ON UNITED STATES etc.

transfer claims under sections 544 and 548, including for the $10,000 gift to his daughter.

- Chapter 7 would allow collective liquidation and ratable distribution of any remaining (not spent after the petition date by Ezell) estate property and pursuit of him for postpetition disbursements of estate property. Collective action against postpetition transferees through the trustee would be more efficient than individual creditors' pursuit of them outside bankruptcy to collect individual claims.

- The case would possibly conclude, one way or another, sooner than July 2026, the maximum chapter 13 plan life.

The disadvantages of chapter 7 include the following:

- The estate would incur priority administrative expenses, including attorney fees and the trustee's percentage commission, including on investigation of the IRA exemption and pursuit of claims against Ezell under sections 521, 542, and 549, the section 547 claim against Jones, and the section 549 claims against postpetition transferees. Considering the relatively small property amounts at issue, administrative expenses could easily approach a significant portion of the amount of the estate assets.

- It could be difficult for Eiler to collect any judgment against Jones or other transferees.

- Substantial court and attorney time would be spent litigating the U.S. trustee's section 727 action.

- The U.S. trustee might not prevail in the section 727 action, thus preventing creditors from recovering more than the chapter 7 distribution.

On balance, I believe that the net advantages of conversion outweigh those of dismissal, and I find that conversion would best serve the interest of creditors and the estate.

## IV.    Conclusion

I will grant the motion and convert this case to chapter 7.

### #